Good morning. May it please the court, my name is Susie Hensler and I'm appearing today on behalf of the appellant Timothy Wilson. The district court made two significant errors in this case. First, it found that an alert by a dog that signaled the presence of narcotics almost every single time he got out of a law enforcement vehicle and was wrong 70% of those times was sufficient to establish probable cause to search the car that Mr. Wilson was riding in. And second, the court failed to grant a mistrial or a new trial in the face of baseless, persistent, and prejudicial questioning that certainly could have influenced the jury's verdict. This case addresses a question which the Supreme Court did not resolve in its recent decision, Florida v. Harris, and that is what happens when there is substantial evidence in the record that a dog is unreliable in the field. Here, this dog alerted 96% of the time and he was wrong 70% of the time. When a coin toss is substantially more reliable than a positive alert by a narcotics dog, that certainly does not signal a fair probability that contraband would be found. When you say he was wrong, the judge in this case concluded, first I guess he assumed that in fact a dog is trained to alert to a scent, not necessarily the actual existence of narcotics or presence of narcotics. And the district court in this case explained why in fact those what you call incorrect or wrong numbers could have been explained by a number of different factors. What was wrong with that? Was that simply not correct on this record? That's right. The court relied on conclusory statements by the government in its argument. A close review of the field reports, which were relied upon in the district court in its opinion, shows that there wasn't, there weren't factors in the record in those cases which suggested the presence of narcotics in most of the cases. The government referred to 20 of these, 20 of these 53 false reports from our perspective. And of those 20, very, very few included evidence like a direct admission by the driver of the vehicle that there had recently been drugs in the vehicle or anything that rises to that sort of behavior. The type of behavior that the Supreme Court in Harris describes in the explanatory footnote on this subject, something like, I believe the Supreme Court referred to five skiers smoking marijuana in a vehicle, leaving the drugs outside of the car, and five minutes later being pulled over. That is not the sort of evidence that we have in this case. In this case, we have a substantial amount of what looks like false, false alerts. In fact, in most of these field reports from the, what we believe are the false reports, there's nothing beyond the original indicators that led to the dog sniff in the first place. You don't dispute the fact that this was a well-trained dog? There's evidence in the record that, in fact, the dog passed the certification test? Well, it did pass the certification test. And, in fact, performed well on those tests, right? It did pass. Yes, Your Honor, it performed well on the certification test. However, in the field, it performed terribly. As Trooper Orndorff, who trained as a team, in his words, and went through the certification process with Camo, the narcotics dog here, stated, he did perform well on the certification test. But Trooper Orndorff was, bared witness to every day for two and a half years when they worked together, him alerting on almost every single occasion and being wrong an overwhelming majority of the time. And the Supreme Court has said over and over and again that a well-trained narcotics dog, both in Cabalas and in United States v. Place, is one that alerts to the, that one who signals that contraband would be found in the vehicle. And we don't have that here. What percentage should we decree as a matter of law? What was your view is that the field test, it was the drugs were found in only 31% of the alerts? Well, luckily, Your Honor, we don't have to, Your Honor does not have to determine what percentage here because this was not even a close call. But you can't imagine that we could take up the issue without giving some parameters. That's right, Your Honor. And I, I believe that this dog performed so poorly in the field. So, so poorly is the test? What, what, if, put yourself in the place of someone who's trying to write this, what boundaries are you giving us? A dog being, performing, excuse me, alerting almost 100% of the time. And in almost 100% of cases, excuse me, almost 70% of cases, contraband not being recovered. So that's your boundary. So that's what we say. Whenever we have a dog who alerts most of the time and mis-alerts 70% of the time, that's not good enough. That's right. So that, and, but that presuppose, that's not a very useful reaction, is it? I mean, first of all, one of the problems here is that we have the data that reflects that. And also that it is, so it, it is an outlier. And it's retrospective. We're deciding this after the police officer relied on a drug sniff of a well-trained dog who passed certification when courts have suggested that it is permissible to do so. The Supreme Court has repeatedly rejected per se rules for making probable cause determinations. So certification alone and viewing certification alone as evidence that a dog is reliable enough to serve as an indicator of a fair probability that contraband will be recovered, in this case would be exactly the sort of rigid application of a probable cause determination that the court was troubled by recently in Harris. After the, after the traffic stop, the officers noted the rental car agreement which authorized Wilson as a driver. And O'Horio was the one that was driving. And O'Horio's license was from a different state from where he indicated. So, and then there were the shaking hands and breathing and everything which is, I mean it wasn't just the dog sniff that contributed to the probable cause, it was that the driver of the car was driving whom the rental agreement gave no authorization to and the license was, he misrepresented his whereabouts. And Wilson was attempting to show a law enforcement badge where he wasn't a law enforcement officer. I mean, camo aside, there's some other, a good bit of other evidence here. Your Honor, all of those other indicators do not rise to the level of probable cause and they would not be a sufficient basis to search the vehicle. And camo's alert added... You can't divide and conquer here, can you? You have to take them in its totality. That's right, Your Honor. And under the totality of the circumstances excluding the dog's positive alert, there was not a sufficient basis to search the vehicle. And the dog sniff added nothing because these officers knew if the dog was getting out of the car, he was going to alert and they knew that that told them nothing about whether or not they were likely to find drugs in the car. So the basic point that Florida v. Harris is making is the reason that the certification programs tend to be valid or tend to be of greater weight than field performance is because a huge amount of the time, the drugs will have been taken out of the car, but the distinctive odor will still remain. And so a dog may alert positive, but the drugs may have been removed from the automobile or the search. I mean, it may be that the drugs are just remarkably well-hidden and escape detection. So didn't the court look upon that as a rationale? That's right, Your Honor. However, the court did not directly address the issue. And on this record, it's not possible to say that in the other 70% of cases that the drugs had simply been too well-hidden or removed from the vehicle. But, Your Honors, I would like to address my second point quickly. Before you get to that, and I'm sorry that you may not get to that, but Judge Duncan pointed out the problem with trying to fashion a test in this case to address this issue of what is good enough. Why do we even need to get there if we can find just based on the good faith exception that the officers acting in good faith based on our, albeit unpublished, case law were entitled to rely simply on the certification and the prior out-of-the-field reliability of this canine? Why isn't that good enough? Your Honors, may I briefly conclude because I see my time? May I briefly? Please answer the question. Yes. Judge Diaz, the Fourth Circuit's case law on good faith does not apply in this case. It's really a red herring because there was no third-party error. There was no third-party error. Sure, it was our error. Well, frankly, I don't even know if we're wrong, but in fact the case law as it existed at the time these officers were operating out in the field said that it was entirely appropriate to rely solely on the dog certification and reliability outside of the field, period. And the third party could be the certifying authority, which probably got it wrong. No, I'm just supplementing his question. I'm not changing it. I'm trying not to. Your Honor, first of all, there was no mandatory authority on the question of what happens when there is certification and something else, and the something else here is substantial evidence that in the field the dog did not perform reliably. And beyond that, the certification authority was not a distinct third party. As Trooper Orndorff testified, he trained with CAMO as a team. He obtained certification with CAMO as a team. So in cases like this where the police error itself is what is at issue in the Fourth Amendment inquiry, it's not appropriate to apply good faith. What's the error? Specifically, what's the error? Relying on a dog that falsely alerts almost 70% of the time in the field, and these officers had a front row seat to his unreliable conduct in the field, and for that reason they should not have relied upon his alert in determining to search the vehicle. Thank you. All right. Mr. Montemarano, we're pleased to hear from you. Thank you, Your Honor. Good morning. I represent Louis Leforio, the driver of the vehicle in question, not the renter, of course. And there are two issues I'd like to address to the Court's attention. As the Court is aware, we have adopted the argument made by Ms. Hensel on behalf of Mr. Wilson concerning the drug dog issue, and I'd be happy to answer any questions the Court might have about those. But I'd like to talk about the polygraph my client passed in September of 2010, well over a year before the trial in this matter. The polygraph was presented to the government. The CV and background information concerning the FBI polygrapher retired, who had 30 years of service at the Bureau. And when the government sought a re-indictment of fully a year after my client passed the polygraph, they did not bother to inform the grand jury that my client had passed the polygraph with flying colors. And why was it required to do that? DOJ manual requires it. Well, that's just a policy matter. It's absolutely true. It doesn't implicate or require the government to do anything. And if the government chooses to violate its policy and not to do so, it is then up to the Court, under its supervisory power, to ensure that the grand jury is permitted to undertake its historic function, as Brandsburg tells us. Well, what supervisory authority does the Court have over what evidence the prosecution declines to represent, declines to present to the grand jury? I mean, if they put on perjured evidence deliberately, then we'd have a different case, I suppose. But it's a big debate over polygraphs and how reliable they are. No doubt. And every, quote, sin of omission. Absolutely, Your Honor. To present this evidence or that evidence. I mean, what supervisory authority over a grand jury does the Court possess to overturn an indictment and dismiss an indictment? Well, I think dismissing an indictment might have been a step too far. And we can see that in our papers. What I would suggest, however, is that Your Honor is absolutely correct. There is at least a question of how far the Court can go. And I think that is an issue that we must analyze on a case-by-case basis. Let us look at this case. There's no objective evidence that Mr. O'Horio was involved. None. There's not an admission. There's no forensic evidence. There's no prints. He acts, and I'm sure Your Honors have watched the videotape. It's in the joint appendix. He acts absolutely unruffled during this. Whereas Mr. Wilson looks like a poster child for ADHD. He's bouncing off the walls. He's shaking. He's nervous. He changes his story repeatedly. Mr. O'Horio does nothing of the kind. Mr. O'Horio's version of what happened remains absolutely consistent from the date of the arrest, July 23, 2010, through the trial at the end of 2011. And it remains unchanged to this day. If there was evidence of Mr. O'Horio's guilt, and they chose not to put on the polygraph, that could be absolved in some way, shape, or form. But when you have no evidence of guilt, except his presence, which the jury instructions used in the District of Maryland and in this circuit, clearly show is not evident. The jury found him guilty under a much tougher standard than a grand jury review. Well, Your Honor, it is said in this business that it takes skill to convict the guilty, but real talent to convict the innocent. And if that's true, then I'm a talented attorney. I was trial counsel. It's on me. I can't put it any differently. I don't know how the jury convicted him. Did Mr. O'Horio take the stand? Yes, he did. Did the jury just not found him? I mean, it would kind of rise or fall on the jury's assessment of his credibility. I would suppose that's part of it. But, of course, the question of credibility and their ability to view that credibility, where the credibility is crucial to the jury's determination, as this court has found when it has permitted the admission of polygraph evidence, as in the Blake case, I would submit to the court. The jury didn't get a very fair picture of who Lou O'Horio was, number one. They were permitted to have questions about his willingness to take the polygraph when there was no question about that. There is a, I think, as well, to be very honest, Mr. O'Horio is an unsophisticated, not especially intelligent young man. Well, he's not so young. He's in his 30s. He didn't make a very good witness compared to an experienced state trooper. Was part of the evidence against Mr. O'Horio Mr. Wilson's testimony? Only in the sense that Mr. Wilson denied knowledge. I'm not sure he tried to finger the other. My client refused to do so because he had no knowledge of it. He, to this day, doesn't know how the crack got into the car. It's easy to suggest it was Mr. Wilson. But wasn't it in a bag? Yes, it was. That also included a Burger King receipt? Absolutely. Half a mile from your client's home in New York? About a full mile. Okay. That's some evidence a jury could have. That's some evidence. Circumstantial at best. I understand you're painting a picture here. But there was evidence in this case from which a jury could come to that conclusion. And a grand jury, knowing my client had passed a polygraph, might not have returned an indictment because the evidence was so thin. The government failed to investigate Mr. Wilson. We did that. And we found out that he grew up in a home, and he freely admitted this on cross-examination by me. He grew up in a home closer to the Burger King than where my client then lived, number one. Did you actually make a sufficiency of the evidence argument before us? I mean, I know you made an argument on, I guess you adopt the suppression motion argument. And Wilson has made a motion to sever. And Wilson made a motion for a mistrial. And you made the polygraph argument. And then there was a safety valve argument. But did you actually, you seem to be making a sufficiency of the evidence argument. But did you make that argument? I didn't make it because I don't believe the case law would support a sufficiency of the evidence argument when it is applied to the jury's consideration of the case. How do we reverse if you didn't make the argument? Because my argument is that there's a question of sufficiency of the evidence to obtain the indictment when there is this. Well, I don't understand how that survives to this point. And I'm a little actually baffled by what your argument gets you. First, as has been pointed out, the policy, the manual itself says it doesn't create any substantive rights. No question. So I don't, even if we agreed with you, what difference would it make? Because the supervisor power of the court can be inserted to question the conduct of the government when its own policy required this number one. When it didn't, but we just established that the manual doesn't require it. I believe. You would have to, I mean, you would have, it says it doesn't. So what would the court be enforcing? And what difference does it make now when we are so far past the indictment and have a conviction by a jury who had the opportunity to observe Mr. Horry? Because the entire trial process ultimately ends up infected by the government's refusal to present this information in a case this thin to the grand jury. And the supervisory power of the court is not to be used in this case to effectuate a substantive right, which is not created by the DOJ manual, but to view the entire trial process and the government's, what we term, misconduct in failing to disclose this to the grand jury. Did the polygraph get into the trial at all? It did not. Did you seek to introduce it? I did, Your Honor. You did? I did. And we asked for that and we asked for other ameliorative steps short of that. We asked for the entire ball of wax, but that's not to suggest that the court was appropriate in saying, you don't get the whole ball of wax, Montemorano, but we'll give you some of it. We'll do something to level the playing field. In Blake, for example, the fact that the client took a polygraph voluntarily was used to dispute his claim when he testified that he had been coerced. We'll hear from you in rebuttal.  Mr. Call. May it please the court, Your Honors. I'm Josh Call for the government. I'd like to start with the canine issue. The canine in this case was found by the district court in its memorandum opinion to be reliable. The court heard testimony from the canine handler. It had the presentation of numerous field and training records that relate to Camo, as well as his certifications that established his reliability. And it had Camo's field records. The court conducted a close analysis of Camo's reliability based on the records from his training, based on his certification, and based on his field performance. And the court found that Camo was reliable and that his alerts, therefore, gave rise to probable cause. That conclusion is supported by the record. And although this case was decided in the district court before the Harris court issued its opinion, Judge Quarles, in addressing this issue, essentially addressed it the exact way that the Supreme Court in Harris suggested that these types of issues. Was this, he ruled before Florida v. Harris? That's correct. And Judge Quarles was prescient in his analysis as to how the Supreme Court would dictate that analysis in this types of cases should go. He did find that the certification of the dog alone established Camo's reliability, following this court's unpublished opinion in Wu. But he also went beyond that. He looked at the training records. He found based on the training records that Camo had established that he was extremely accurate. Florida v. Harris kind of backed him up, didn't it? Absolutely it did, Your Honor. The court in Harris explains that probable cause determination, and Ms. Hensler is correct about this, it can't be based on a per se or a bright line test. It's a multi-factor test. But Judge Quarles engaged in exactly that sort of analysis here. I would note that the court in Harris wrote that in most cases a dog's field performance records have relatively limited import and that the better measure of a dog's reliability comes away from the field in a controlled testing environment. Can I ask you about the sufficiency of the evidence with respect to Pajorio? Because, you know, we don't have a sufficiency of the evidence claim before us, but the drugs were found under Wilson's seat. The counsel makes the argument that of the two people, the one that came unglued was Mr. Wilson, and he says Pajorio was relatively composed. You would make me feel a little bit better if you'd tell me why it was a just result to convict this man. Absolutely, Your Honor. First of all, this is a car that had been rented that morning by Mr. Wilson. Mr. Ahorio had driven a different vehicle from New York City to New Jersey. Mr. Ahorio lived in the Bronx in New York. He drove to southern New Jersey to meet with Mr. Wilson. They then drive south coming through Maryland and are stopped. It's just the two of them in the vehicle. Drugs are eventually found under the passenger seat, under Mr. Wilson's seat, as the court said. Mr. Ahorio was not an authorized driver of the rental vehicle, yet he was driving. I'd be devil's advocate. Couldn't they just be two friends driving from New Jersey into Maryland? That was the defense essentially raised by each defendant, which the jury rejected, and I think that decision was the proper one for several reasons. First of all, clearly drugs were found under the seat, so there's... We can't use that. That alone is not sufficient, I agree, Your Honor, but that's obviously the fact that there are only two people in a car with drugs is a significant fact. It's not inconsistent with the scenario that they were just friends. That's correct, but in addition to that, as Judge Diaz pointed out, the drugs were found in a Burger King bag. The Burger King bag had a receipt from a Burger King that was... I thought it was less than a mile from Ahorio's house. Remember, Ahorio lives in the Bronx. That's where the Burger King receipt is from. Wilson lives in southern New Jersey. Now, Mr. Montemarano at trial tried to establish some... Did the Burger King receipt cover both breakfasts or whatever? Did it cover both of their meals? The Burger King... I candidly don't recall what the meal was. I think it was just a single meal. The government's theory at the case, Your Honor, was that Ahorio had transported the drugs from New York to New Jersey where they met, and they were traveling south where Wilson had contacts. They were going to see Wilson's family. The Burger King receipt is strong corroboration from that theory because Wilson lived... The first leg of the trip Ahorio made by himself. That's correct. Ahorio drove by himself from New York to New Jersey where he met with Mr. Wilson. Now, Mr. Wilson's ties to the neighborhood that Mr. Montemarano was talking about predated this event by 10 years. He hadn't lived in that neighborhood since, I believe, the 90s. Wilson testified against Ahorio, essentially? They both testified. I would not characterize either of their testimonies as being against the other. Both of them simply denied knowledge whatsoever. Neither of them at any point... But if one had no knowledge, the other did. Well, there's also the possibility, as Justice Stevens pointed out in his concurrence in Zafiro, that neither person knew what was there. That seems a little less likely. I don't disagree with you, Your Honor, but the government called a rental car person who had testified at trial as to all the process he did to clean out the car, that sort of thing. What was the quantity here? The quantity was, I believe, a little over 300 grams of crack cocaine. It was a distribution amount, clearly. Yes. And going back to the evidence against Mr. Ahorio, Your Honor, Mr. Ahorio's hands were shaky, the officer observed. He said they were more shaky than the typical person. In addition, Mr. Ahorio stepped out of the vehicle during this encounter, and at one point the officer said to him, so does everything in the car belong to you? And he says, no. And the officer sort of reacted. He was surprised by that response. He said, wait, does it belong to you? He said, no, it don't. It didn't belong to him. He didn't want it to belong to him. That's exactly right, Your Honor. And then he was asked if he would give consent to search. And he said, you have to ask him, referring to Wilson. He wouldn't... Now, you know, Wilson was the renter, to be sure, but those are not the types of responses that are consistent with innocence. He then was questioned by the officers later on, and he denied culpability, but the officers explained that he often gave vague responses. At some points he would put his head on the table when he was asked questions. This was not the type of encounter that... This is not the type of case where the jury had... The jury's decision to convict the defendant was not amply supported by the evidence. There were numerous reasons for the jury to conclude, particularly given the Burger King receipt. Let me ask you a few more questions about Cammo and this district judge's analysis. You know, I agree that he attempted to explain why what purported to be unreliability in the field might have been attributed to something else. He went through the direct and indirect evidence of why, in fact, drugs could have been in the car or cars at the time when they were not physically found, even though the dog had alerted. Some of that seemed to me to be pretty skimpy, to be frank. But the other problem I had, and I think I recall this correctly, is that it appeared that the trainer in this case would only reward Cammo when he alerted positively, which is troubling to me. Can you help us out with that? Absolutely. Let me address the second point first, Your Honor. There was testimony in the record that the Kong, which is the device that's given to the dog, was only given when there's a positive alert. I assume that that's the case with all narcotics canines. Perhaps that's wrong. I don't think so. Well, it's not on the record, but my understanding is that that's not the way it's supposed to be. Okay, I... Your Honor is probably correct, but I do know that you are correct. He was rewarded only when he alerted positively. But I would direct the honor to his exercises, his training exercises, in which... Something happened there, and he... As the officer testified, he was... They gave him, I think, what he called blinds, which were alerts, or food and things like that, to try to sort of test the dog to see if it would falsely alert. And in the training exercises that he did, which the trooper testified, there were over 100 of those, only one time did he falsely alert. So in cases where officers knew that there might be a reason to false alert, he essentially almost never did. He also never missed an alert. Now, going back to the point about the strength of those other cases, it's undisputed that in 24 of the cases there were drugs found. And I would direct the court's attention to joint appendix. Could I just ask, how bad would a dog have to be to fall outside the purview of Harris? The touchstone, Your Honor, is reliability. But reliability... And you're saying that as long as the dog is reliable in field tests, is certified and is reliable in field tests, the fact that his reliability in the field is worse than a coin toss is not to be taken into consideration? Surely that can't be, because even in Harris, as I recall, the court indicated that controlled environment data could be relevant. Our position isn't that the data in the field is irrelevant, Your Honor, but that the significance of it in the overall inquiry is much less significant than the training and certification records, which the court held in Harris. Because in the controlled environment there actually is a precise measure as to the accuracy of the dog, whereas in the field, there's no way to know whether the dog is alerting mistakenly or it's alerting to the lingering odor of drugs. And I would say in this case, there is a very strong... There's very strong evidence, I think, that the dog was alerting in many of these cases to the lingering odor of drugs, even where drugs weren't found. In a motions filing before the district court, the government described these in some detail. This is at pages 114 and 115 of the joint appendix. There are two lengthy footnotes in which the government goes through the 20 cases in which there was direct evidence that somebody either had recently used drugs in the car or at least quite possibly had. And then it also goes through many of the 33 cases in which there was significant evidence to think that there may have been. I'll just read a few examples. These are cases where drugs were not found. The driver admitted that he and his girlfriend smoked marijuana in the vehicle. That was one case where drugs were not found. The driver stated that her cousin owns the vehicle and may have had CDS in it earlier that day. The driver stated that he may have had someone in the truck that had drugs on him or her earlier in the day. Blunt shaving on the floor, and so forth. Those are some of the 20 examples in which there's sort of direct evidence that drugs either were or may have been in the car. Your Honor, this is joint appendix... At 114 and 115 in the footnotes, the government puts all these together. And then the records that actually support that are an attachment to that filing, which is also in the record. That's at pages 151 to 233, so the court can cross-reference the actual reports from the field to the government's filings. And likewise, with respect to the 33 cases, here are some examples from the reports. The driver was nervous, stated that he had just gotten out of prison for drug distribution, and told a story that didn't make sense. Another example, the driver was nervous, friends shaking, car had numerous air fresheners, and driver was wanted in Wicomico County. So the point is, even though Camo in those cases, according to the defendants, falsely alerted, there's ample reason to think that his training records are a much closer reflection of his actual skill and more closely reflect his accuracy. I would also note that the training records here are not just good, but they're outstanding. He had one miss, essentially, in his training. So there's ample reason here to think that Camo was reliable. With respect, briefly, to the polygraph issue... Is there anything that you have to add to the comments made from the bench? I don't think so, Your Honor. And actually, if the court doesn't have any questions with respect to the other issues, I just ask that the court affirm the convictions in this case. Thank you, Your Honor. Ms. Hensler, you have to give your rebuttal. Your Honors, I would like to briefly address the second issue raised in my brief, which was the court's error in not granting either a mistrial or a new trial after counsel for Lou Ahurio raised a prejudicial line of questioning seven times. So in Judge Quarles' words, he referred to Mr. Wilson's drug-dealing relatives, which, Judge Quarles ruled, had absolutely no relevance to the case, on seven separate occasions, after being cautioned three times. And so, again, this wasn't a case where there was an isolated comment, an isolated reference to drugs. This was a case where co-defendants' counsel returned repeatedly over the multi-day trial to a prejudicial line of questioning. And... Judge Quarles gave repeated instructions. That's right, Your Honor. The first time this issue came up, there was a three-page bench conference. He struck the question. He instructed the jury to ignore it. And the very next question was on the same subject. And it mattered in this case because, as Judge Diaz pointed out, the only smoking gun evidence in this case was a Burger King receipt that pointed directly at Mr. Ahurio. It was the bag under his seat. That's right, Your Honor. However, there was testimony in Mr. Wilson's defense by an investigator from the Federal Public Defender's Office that this make and model of the car... In this make and model of the car, a person in the passenger seat could not see what was stashed underneath the passenger seat unless they put their head flush against the floor of the car. And the trooper, Trooper Orndorff, also testified that he couldn't smell the drugs until his face was on the floor of the car. So there was substantial evidence that somebody in the passenger seat could not see or smell the drugs underneath the seat. And again, this smoking gun evidence pointed straight at Mr. Ahurio. So, again, because the court could not cure this taint and because co-defendants counsel returned to this well again and again, and the question... These questions related to the exact same type of conduct at issue here, drug distribution, at around the same time, five weeks before the search. The co-counsel brought these things up. They didn't come up in the form of testimony. They came up in the form of questions. Well, there were certain answers to certain questions. And even at one point, there was an objection, and Judge Quarles overruled it on the basis that co-defendants counsel promised to tie this all up in the end. He promised to show in closing, through his client's testimony, that this drug-dealing relative's defense... No, Your Honor, the effect is the same. It deprives my client of a fair trial. Scratching and clawing on behalf of his client. He's got to fulfill his obligations under the adversary system as well. The judge did what he should have, and even when he continually made references to the fact that you don't consider somebody by virtue of their relatives, you have to judge his behavior on its own. I mean, he didn't just allude to this once. He hammered it. Well, again, Your Honor, while certainly Mr. O'Rourke's counsel had certain duty of zealous advocacy to his client, as Judge Quarles himself noted, if the defense was going to be Mr. Wilson's drug-dealing relatives, then he had an obligation to cut Mr. Wilson loose because those sorts of defenses, certainly in the way that it was presented, without any basis, without any basis in evidence that was offered in the trial, is not consistent with Mr. Wilson's constitutional right to a fair trial. And for that reason, I ask that Your Honors vacate his conviction. Thank you. Thank you so much. Mr. Montemarano? May I pose a question, Judge Wilkinson? Is everything on the bench yours? Because if you deny that it is, and I know it's not, I saw Your Honors walk into the courtroom carrying each of your pile of documents relating to the cases today, would you be attempting... What are you asking me? Is everything on the bench yours? Because if Your Honor says, no, it's not, I saw each of you bring in documents for today's arguments. And if you deny that everything on the bench is yours, is it only because it's true? Where are you going with this? Mr. Call referred to Mr. O'Horio's denial of everything being in the car as being his. If you watch the videotape, he attempted to explain, no, just the black gym bag is mine. Trooper Corporal Kennard cuts him off. That's the nature of the evidence in this case. Let's take something that happens and put the most... incredible amount of spin on it so as to implicate Lou O'Horio. Let's go back to the Burger King receipt. The receipt's dated a week before the arrest. Plenty of time to prepare this package for insertion beneath the seat, where clearly it wouldn't be seen or smelled. Mr. Wilson drives a delivery truck for the New York Daily News. He's driving all over the city. He knows where the Burger King is. He knows it's near Lou O'Horio's home. So he gets a bag. The bag was unnecessary, as demonstrated to the jury in my closing argument. I took a bag of Cheerios, which looks the same texture and color as crack, wrapped it in a blue Ziploc freezer bag, like the original stuff was, and put it in an opaque white grocery bag. At that point, you couldn't see what it was. The Burger King bag's only necessary to set up Mr. O'Horio, to put it in a location near his home, a location Mr. Wilson knew about because he knew the neighborhood, because he'd lived there. Yes, ten years before, but I don't think his memory is that dim. He still has family and friends who live in that neighborhood. He admitted going to that neighborhood. That's the nature of the case against Lou O'Horio, Your Honor. Thank you. And I see you're court-appointed, and I appreciate the efforts that you've made to help stop your clients.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Albert Diaz